**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| **PATRICIA ENRIGHT** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Civil Action No:_____ |
| | ) | |
| | ) | |
| **EXPERIAN INFORMATION** | ) | |
| **SOLUTIONS, INC.** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Patricia Enright, by and through counsel, brings this Complaint against Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.      By mid-March 2020 the CDC and the government asked that American people to take 15 days to stop the spread of COVID.  That shutdown rapidly expanded across the nation with schools and most businesses shuttered.  Employees left their offices and started to operate remotely.  No longer were businesses operating as usual and all new protocols and procedures were taking effect across the country.  Despite these shutdowns and new protocols, companies and the CRAs continued to credit report.  This unprecedented disruption to the American way of life had profound impact on every facet of business and credit reporting was no exception.  However, the presumption that furnishers were acting as normal and providing accurate credit file data was no longer reliable and credit reporting agencies had an obligation to make changes to their own protocols and procedures to ensure that what they were reporting was accurate and to adequately address the disputes of consumers that were brining errors to its attention.  Ms. Enright was one of

these consumers, but Experian failed to take her disputes seriously and investigate the factual basis of her claims against the data that it had and knew from its own records. Ms. Enright had an auto lease with Subaru Motors Finance that was being serviced by JPMorgan Auto ("JPMC" or "Chase"). Her 42-month lease was ending in November 2020 and she wanted to purchase the vehicle, so she asked Subaru for a buy-out number. At the time the lease was current and never late. Because it was in the heart of Covid, getting the payoff information and finding a way to purchase the vehicle was far more difficult than in non-pandemic times. Ultimately, she obtained a buy-out number, secured an auto loan, and paid the stated amount of $12,392.12. Subaru Motors Finance acknowledged that on July 31, 2020, it received the $12,392.12 payment, and reported the receipt of that payment to Experian as of September 2020. JPMorgan was credit reporting the account and reported that the account was paid on time for the months of June and July 2020. Having received and receipted the lump sum payment of $12,392.12, the auto lease had been paid in full and on time through the scheduled end of the lease term in November 2020. For reasons that remain unknown and likely due to COVID disruptions, Subaru Motors Finance believed that the buy-out was short $851.20, and sent Ms. Enright a letter dated August 11, 2020, admitting that it had received her payment as of July 31, 2020, stating that the pay-off was short, but it never explained why Ms. Enright owed more money on the account. Despite the fact that all lease payments had been made timely, that it had been paid $12,392.12 and the lease term had not come to a close, JPMorgan decided to report that the account was charged off in August 2020. Ms. Enright paid the amount she was told and wanted to know why Subaru Motors Finance was claiming that she owed more. Clearly there had been some accounting error, but she could not discover what or why. In November 2020 as her lease was coming to a close, Chase sent her an itemization of payoff for the vehicle if she wanted to purchase it at the end of the lease term. In

2

that correspondence Chase claimed that she owed $13,207.95 to buy out the vehicle.  However, that accounting failed to mention the credit for the $12,392.12 that Subaru Motors Finance had received and acknowledged.  Ms. Enright followed up with both Chase and Subaru to figure out what the confusion was.  JPMC only made matters worse with the new credit reporting to Experian. It reported that the account was charged off in July 2020, and that $12,364 was written off as bad debt.  Ms. Enright was fighting with Chase and Subaru about resolving the accounting and getting her title since she had paid the full amount it told her she had to pay in July to purchase the vehicle. In April 2021, Chase finally resolved the issue and sent her a bill of sale, the release of the lien and the title to the vehicle.  In the bill of sale Chase identified the date of sale as December 18, 2020 and the amount due was $12,393.12, the exact amount that she had paid and they accepted back in July.  Thus, by April 2021 Chase acknowledged that the account had been paid in full back in July 2020, Chase had released its lien, and the vehicle had been purchased and sold in December 2020.  While that should have been the resolution and the end of the story, the Experian credit reporting errors persisted.  Despite the fact that Chase had acknowledged in writing, with a bill of sale and release of the title and the lien that the vehicle sale had been completed on December 18, 2020 and paid in full, it reported that the balance due in January 2021 was $12,364.  As of October 2022 after the account had been paid and satisfied and the title transferred, Experian was reporting the account as charged off in August 2020, April 2021 and May 2021 and as of May 2021 it was closed with $12,364 written off.  This marked a change in the credit reporting from the original date of charge off in July 2020 to August 2020 and the notation that the account was in good standing in July 2020.  When Ms. Enright discovered the credit reporting errors, she had her ex-husband send a letter on his law firm letterhead notifying Experian of the error.  When that did not work, she sent two more dispute letters with the documents to prove the timing and history of the

payments. Experian failed to enact sufficient COVID procedures and protocols to protect consumers like Ms. Enright from the obvious accounting and credit reporting errors during that period and failed in its duties to ensure maximum possible accuracy in the data it is reporting. The combination of the data that Experian had about this account, the information and explanations in Ms. Enright's three dispute letters and the documentation that she provided from Subaru and Chase all proved the same thing: that she paid for the vehicle in July, the sale was closed in December and the amount that she paid and Subaru admitted receiving in July was the exact amount listed in the bill of sale in December. Despite all this information, Experian failed to report accurate credit information and recklessly and negligently reinvestigated Ms. Enright's consumer credit disputes. Accordingly, Ms. Enright requests an award of actual damages, statutory damages, punitive damages, attorney's fees, and costs based upon Experian's violations of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq*.

**Parties**

2.      Plaintiff Patricia Enright is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because she is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Patricia Enright.

3.      Defendant Experian Information Solutions, Inc. (hereinafter "Experian"), is a foreign limited liability company with a principal office address in California. Experian is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. Experian regularly conducts these business activities in the Eastern District of Virginia by providing credit reports and other products to consumers and businesses in the Alexandria division

4

of the Eastern District of Virginia.  Experian maintains the office of a registered agent in the Eastern District of Virginia, and it regularly litigates cases in this district and division.

### Jurisdiction & Venue

4.      This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p).  Venue is proper in this jurisdiction by virtue of the business that Experian conducts in the Alexandria Division of the Eastern District of Virginia and based upon the maintenance of the office of a registered agent in the Eastern District of Virginia.

### Factual Allegations

5.      Ms. Enright leased a vehicle through Subaru Motors Finance.  Subaru Motors Finance is affiliated with JP Morgan Auto, who is the furnisher of the credit information related to the inaccurate credit reporting at issue in this action.

6.      The 42-month lease term began in May 2017 with the final payment due in November 2020.

7.      Ms. Enright made all of her lease payments on time.

8.      By the Summer of 2020 COVID protocols had been in place for months and it was difficult to get companies to provide consumers with account information.

9.      Ms. Enright wanted to purchase her Subaru and started the process early.  Rather than wait until November when the lease was ending, she decided to get a payoff in July 2020.

10.     Subaru Motors Finance provided her with an exact number of $12,392.12.  Ms. Enright obtained an auto loan for that amount and tendered the check to Subaru.

11.     By letter dated August 11, 2020, Subaru admitted receiving the check on July 31, 2020.

12.     Subaru also told her in that August 11, 2020 letter that the payoff was short and that she needed to tender an additional $851.20 to pay off the vehicle.

13.     Ms. Enright wanted to know why the number had changed from what they told her, but it was during Covid, and she could not get a straight answer from them.

14.     Based upon the data reported by Experian, the original account balance was $9,681 and her approximate lease balance at the time of the car purchase in July 2020 was a little over $900.  Experian knew these details as well as the payment history for the account based upon the data that had been provided to it monthly by JPMC and was in its own records.

15.     Subaru Finance bungled the posting of the payment and the conclusion of the lease. Rather than post the funds to the remaining $900 lease balance and show that the lease had been paid ahead through the end of the lease term in November, it erroneously reported the account as a charge off in July.  The very month it received the $12,392.12 payment, it reported to Experian that the account was a charge off and claimed that it wrote off $12,364.

16.     Ms. Enright had paid the amount that Subaru Finance told her to pay and kept pressing for the release of the title.  In November 2020 right before the end date of the lease Chase sent her a letter that had the heading: "Itemization of Payoff for Lease Vehicle Purchase."  The new balance was disclosed as $13,207.95.  Despite the fact that it still had her payment of $12,392.12, it showed no credit for that payment.

17.     Ms. Enright continued to fight for the release of her title and the resolution of this payment issue.  Finally, on April 28, 2021, Chase sent her a VEHICLE BILL OF SALE in which it acknowledged that the payoff amount was the exact amount it had originally quoted her: $12,392.12.  It also recorded in that Bill of Sale that the date of the sale was December 18, 2020.

18.     Because that was the exact amount that she had paid back in July 2020, Chase released its lien on the vehicle, assigned the title to her and sent the actual title to her so that she could register it with the DMV. Thus, by December 18, 2020, Chase acknowledged that this problem had been resolved and Chase admitted that it had been paid in full for the vehicle in the exact same amount that it received back in July 2020.

19.     Despite the fact that she had finally convinced Chase that she had paid the correct amount back in July, her problems were far from over. Now she had to grapple with the erroneous credit reporting on the account.

20.     On June 17, 2022, Ms. Enright obtained a copy of her Experian consumer file disclosure in order to try and correct this inaccurate and unfair credit reporting. The JPMCB Auto account at issue in this action for the lease from Subaru Finance reported that it was charged off in both July 2020 and December 2020. The account status as of May 2021 was "Paid, Closed. $12,364 written off. The very month that it admitted in writing that it had received $12,392.12, it reported to Experian that it had charged off the account and written off a lesser balance of $12,364.

21.     In the payment history for this account, JPMC and Experian were reporting that the account was an Auto Lease and that the original amount of this account was $9,681. In the monthly payment history of that June 17, 2022, consumer file that Experian sent to Ms. Enright, Chase was reporting that prior to July 2020 the account was in good standing and had been paid as agreed. In July 2020 Chase reported that the balance due was $1,175. In August 2020 it claimed that the balance due was $945 and that it had received a payment of $253. In September 2020 it reported a balance due of $982 and that month it received a payment of $12,392. In October 2020 it reported that Chase had received a payment of $113 and that the account balance had dropped to $906. For the month of January 2021, Chase reported the balance due had ballooned to $12,364 and that the

account had been charged off again in December 2020. These dates and amounts would all change soon.

22.      On its face, Experian could see from its own records and data that there was something seriously wrong with the way this trade line was reporting. There was no past-due balance reporting, which meant that the account had been paid. The only date of payment of that lump sum ($12,392) was in September 2020, four months before Chase claimed that there was a charge off and that it had written off the lesser sum of $12,364. Experian could see from its own trade line data that this was a 42-month lease that was opened in May 2017, which would make the end date November 2020. The account was never reported as much as 30 days late and the payment history reflected that she continued to make payments and Chase was accepting payments after the alleged charge off in July of 2020.

23.      Experian's computer and employees could see that this was an auto lease that did not end until November of 2020, that a large lump sum payment was being reported two months prior to the lease end, and that Chase was erroneously reporting that the account had been charged off in July 2020 or four months prior to the end of the lease term.

24.      In June 2022, Ms. Enright worked to clear her credit of the inaccurate credit reporting related to the JPMorgan account at issue in this action. Discovery is necessary as to any on-line disputes that Ms. Enright conducted during this time frame.

25.      In an effort to clear her credit reporting of this inaccurate information, Ms. Enright, through counsel Donald R. Calaiaro, issued a credit dispute letter dated July 2022 that explained the circumstances of the completion of the auto lease, that Ms. Enright purchased the car out of the lease, and that information reported regarding the $12,364 was inaccurate and inconsistent with

the facts that transpired in the case.  The letter requested the correction of Experian's inaccurate credit reporting.

26.     On July 25, 2022, Joy Allison, Senior Regulatory Affairs Associate for Experian issued a letter to Mr. Calaiaro that read in part, "We are currently reinvestigating the information with which the consumer disagrees.  Upon completion of the process, we will provide the results of our reinvestigation directly to your client."

27.     Despite this letter, Ms. Enright does not have a current record of receiving a response to this dispute.  Based upon information contained in correspondence from Experian in October 2022, Experian processed the dispute in July 2022, but it did not remove the derogatory and inaccurate data.  It appears that Chase/Experian added new and modified charge-off notations for this account.  Instead of the original charge off in July 2020, that date moved to August 2020. Instead of the second date of charge off in December 2020, that changed to April 2021 and May 2021.  The payment data for July 2020 was now reporting as "OK" and the data for December 2020 was reporting as ND or no data.  What should have been accurate and fixed credit reporting for an old account, was now fluctuating like the wind and Experian could see it and track it.

28.     No reasonable reinvestigation after receiving a dispute would result in this credit reporting because Experian could see all of the monthly lease payments were paid on time and a large payment of $12,392 was made before any charge-off notation and made at the same time the previous account balance was around $900.  Experian should have solved the credit report problem immediately upon receipt of the dispute.  Moreover, the shocking disparities in the data should have been known to Experian without Ms. Enright even making a dispute because Experian has a statutory duty to report accurate data.

29.     In late September 2022, Ms. Enright sent another credit dispute package to Experian.  She once again provided detailed information regarding the JP Morgan account that proved that Experian reported inaccurate information, misleading information, and information that was inconsistent with what happened both factually involving the account history and how Experian's data contained factually inconsistent information.  The letter noted that the information Experian reported could never be accurate based upon the factual circumstances identified in the letter because: 1) she bought the car as she was permitted under the terms of the lease; 2) she obtained a pay-off figure before the end of the lease term; 3) she obtained a new loan from a different creditor and Subaru Motor Finance admitted receiving the payment in July 2020.  To support her facts, Ms. Enright included a copy of the August 11, 2020 letter from Subaru Motor Finance that was "concerning your recent pay-off on the above referenced account."  No matter what the nominal balance that Subaru claimed was due, the irrefutable facts are that it was a current account in July 2020 and she paid $12,392 on July 31, 2020.  Experian's data always reflected that Experian knew Ms. Enright paid a lump sum because Experian's trended payment data showed a $12,392 payment on July 31, 2020.  Experian's information about the status of the account was false, inaccurate, misleading, and inconsistent with the facts proven by the dispute letter.

30.     Ms. Enright's credit dispute letter further explained that no one at Subaru Motor Finance could explain how there was any problem with the payment after receiving the pay-off at the time of payment.  The credit dispute letter clearly described the circumstances and payment history that Chase had acknowledged in writing and Experian could see from its records.  Experian and Chase were reporting that all payments were made on time and there was a large lump sum payment receipted prior to the end of the lease term in November 2020.  The letter went on to explain that no matter what Chase thought of the amount of the payoff payment, that at a minimum

it prepaid the remaining four lease payments, and it was totally inaccurate to report the account as abruptly charged off in August 2020, right after Chase acknowledged receiving the lump sum payoff amount.  The credit dispute letter included supporting documentation for Experian to review and consider including a copy of the lease, the August 11, 2020, letter from Subaru Motors, and the authorization for payoff to corroborate all the factual assertions of the credit dispute letter. At the time Experian received the credit dispute and supporting documentation, Experian had internal data and supporting details and documentation such that it could never verify the derogatory information it reported about the account because Experian's information was misleading, inaccurate, and demonstrably unverifiable.

31.     Experian knew that the payoff was submitted during the heart of Covid, that Subaru Finance had confirmed in writing receipt of the payment and even reported that payment to Experian as part of the account payment history.  The fact that JPMC misallocated the funds, misrepresented the balance due in January 2021 and misrepresented that any amount had ever been charged off was likely due to the failure to enact reasonable procedures to ensure that this did not happen after Covid and workers were no longer reporting to an office.

32.     Experian should have instituted new procedures during the Covid reporting period to take into consideration that the workforce for its reporting entities and furnishers were no longer operating as usual and had been forced to adopt new operations, schedules, and locations.

33.     The credit dispute letter contained a lot of information for Experian to review and consider upon receipt of the package.  Unfortunately, Experian has instituted an outsourced, automated, and electronic process to handle consumer credit disputes.  In all likelihood, this detailed information was outsourced, converted to electronic data, and a resulting ACDV was issued to the furnisher.  Experian does not implement a system to meaningfully review and

11

consider the information provided by a consumer after receiving a consumer credit dispute. This system negligently and recklessly violates multiple portions of 15 U.S.C. §1681i(a).

34.     Based upon information and belief, Experian failed to enact and institute new procedures and protocols after the Covid shutdowns. Experian needed to increase its efforts to investigate disputed credit file data during Covid and only discovery will reveal what adjustments and changes (if any) it made to deal with the dramatic changes in the financial indistries.

35.     On October 4, 2022, Experian issued dispute results to Ms. Enright. The letter included boilerplate language as follows: "We reviewed the documentation you provided with your dispute, but determined that it was not sufficient to make the changes or deletions that you requested." What that really means in Experian speak is that Experian decided to ignore the documents, information and attachments that Ms. Enright provided so that it could shift the burden of investigation to JPMC. Had Experian bothered to compare the attached documents with its own information, it would have discovered that Ms. Enright had fully honored her lease agreement, purchased the vehicle before the end of the lease terms and was never in default.

36.     Experian's reinvestigation simply repeated the previous data reported and likely parroted the ACDV response of the furnisher. Discovery is necessary as to who at Experian considered the information from the ACDV response, compared it to the information and documentation in Ms. Enright's dispute package as well as Experian's data and then complied with the reinvestigation obligations set forth in §1681i(a)(4) and (5).

37.     Ms. Enright had always maintained an exemplary credit history, and she could normally use her credit to finance real estate and other purchases. She desperately needed an accurate credit report because she needed to move to a residence that better fit her current lifestyle. On or about September 30, 2022, Brentwood Bank sent Ms. Enright a credit denial letter that stated

her Experian credit score was 657 and that the first key factor was "SERIOUS DELINQUENCY". Based upon information and belief, the only possible serious delinquency that would have been a key factor affecting Ms. Enright's credit score was the account at issue in this action.

38.     In January 2023, Ms. Enright once again tried to get Experian to remove the inaccurate derogatory information regarding the car transaction with Subaru and JP Morgan from her credit reporting.  This dispute letter started by informing Experian that this was now at least her third attempt to get the problem with the inaccurate JP Morgan account solved because the credit reporting reflected an accounting and processing problem and not the way she handled her credit.  The letter begins by stating that she leased a Subaru for 42 months and that the lease would have ended on November 30, 2020.  She decided to purchase the car and four months before the end of the lease term obtained a payoff quote.  She obtained a bank loan, and the proceeds were tendered to Subaru/JP Morgan, and a letter indicated that they acknowledged receipt of the money on July 31, 2020.  Experian's own internal trended payment data reflects a July 31, 2020 payment, which verified this portion of the letter.  Ms. Enright described how she contacted Subaru to try and get a number for additional funds to payoff the account, but she never received a straight answer or a demand for payment that properly accounted for the facts of the transaction.  By November 2020, Subaru/JP Morgan falsely claimed she owed an additional $13,207.95 to purchase the vehicle since that amount failed to credit what she had already paid.  Ms. Enright's January 2022 dispute letter went on to state that ultimately Chase sent a vehicle bill of sale document/letter dated April 28, 2021.  That Bill of Sale identified the actual date of sale as December 18, 2020.  Thus, Subaru acknowledged receipt of the loan proceeds/purchase money and payment from Ms. Enright on July 31, 2020, listed the date of sale more than four months later and delayed another four months before releasing its lien and sending the executed title and transfer

13

documents. These facts totally contradicted Experian's reporting that the account could have been charged off in July 2020, August 2020, December 2020, April 2021 and May 2021. The credit dispute package included copies of the bill of sale, released title, and letters from Subaru Motors Finance that corroborated the facts identified in the credit dispute letter.

39.     The only way that Experian could claim that the documents Ms. Enright attached were insufficient to make the changes, is if it failed to review and consider them in direct violation of §1681i(a)(4). Those documents together with the file data information that JPMC was reporting to Experian demonstrated beyond any doubt that what JPMC was reporting was inaccurate. The combination of the Chase verification of receipt of the payment of $12,392.12 on July 31, 2020, the bill of sale dated December 18, 2020 reflecting the amount of sale was exactly the amount of that verified payment ($12,392.12), and the release of the lien and title to the vehicle, prove that Chase had the payoff money in its possession since the end of July 2020 and that it admitted that constituted payment in full. Since Chase's own documents verified that the sale was closed and completed in December 2020, any representation that there was any charge off or that the account could have been charged off as a bad debt in April and May 2021 was demonstrably false. Only by ignoring and not examining those documents could Experian continue to verify that this account was charged off in May 2021 or that Chase wrote off $12,364 as bad debt in August 2020 after it admitted receiving $12,392.12 the month before and further admitting that actual payment amount was the full amount necessary to purchase the vehicle, transfer the title and release its lien.

40.     On February 8, 2023, Experian issued the results of the reinvestigation from Ms. Enright's credit dispute. Experian continued to credit report that the account had a charge-off credit history for May 2021, April 2021, and August 2020. These results demonstrated that Experian could not have reviewed and considered all relevant information submitted by Ms.

Enright in direct violation of §1681i(a)(4) or complied with the steps in §1681i(a)(5). The letters from Ms. Enright, the correspondence from Chase, the payment history in Experian's own records all prove exactly what happened in this case: Ms. Enright was provided with the correct payoff figure back in July 2020, she obtained a bank loan and submitted the check to Chase, Chase received the money, and it took it a few months to issue the bill of sale and release the lien. More importantly, it proves that Chase had all the money it claimed was due to pay the final remaining lease payments and purchase the vehicle at the end of the lease term in July 2020 and any assertion that this account could have been charged off after July 2020 was patently false. Experian negligently and recklessly violated multiple provisions of the steps for FCRA compliance required by 15 U.S.C. §1681i(a).

41.     On February 16, 2023, Ms. Enright inquired with First National Bank of Pennsylvania to see if she could qualify for a loan. Once again, she was denied that loan and told that serious delinquency was the first identified key factor affecting her credit score. Ms. Enright continued to be frustrated that her credit score was lower than it otherwise should have been and lenders continued to identify serious delinquency on her previously clean credit history.

42.     Ms. Enright continued to seek a lender that would support her efforts to purchase a home that fit her needs. On or about July 11, 2023, Ms. Enright submitted credit information to Union Home Mortgage who indicated based on her credit history and other factors, the best she could possibly qualify for was a $100,000, which would have made it difficult to find an acceptable home.

43.     Given the egregious manner that Experian handled Ms. Enright's credit disputes, punitive damages are necessary to deter Experian and force it to change its reinvestigation practices. Among the factors that support substantial punitive damages is the fact that Experian

takes in immense revenue as a credit reporting agency, yet it refuses to allocate reasonable resources to process consumer disputes to ensure maximum possibly accuracy of its data. According to Experian's website, the Consumer Services division contributes 20% to its global revenue.  In addition, Experian's website states that it had operating revenue of $4,861,000,000 in 2019.  *See* www.experianplc.com/investors/key-financial-data/.  Experian earns massive profits processing and selling consumer data, but it refuses to take consumer accuracy disputes seriously as required by §1681i of the FCRA and instead outsources those duties to poorly trained and supervised processors to save money and further increase corporate profits.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. §1681i**

44.     Plaintiff incorporates paragraphs one (1) through forty-three (43) as if fully stated herein.

45.     Defendant Experian has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Experian is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681i by failing to comply with the enumerated statutory provisions when Ms. Enright disputed the accounts identified in her credit dispute letters.

46.     Experian's reinvestigation procedures do not comply with the stated statutory requirements of 15 U.S.C. §1681i(a)(1) through §1681i(a)(5).  §1681i(a)(1)(A) provides that upon notice of the dispute that Experian is obligated to: "conduct a reasonable reinvestigation to determine whether the dispute information is inaccurate."  Next, §1681i(a)(2) obligates Experian to: "provide notification of the dispute to any person who provided any item of information in dispute."  §1681i(a)(4) details the scope of Experian's reinvestigation under paragraph (1) and

makes clear that Experian Information Solutions, Inc. "shall review and consider all relevant information submitted by the consumer…with respect to such disputed information." Finally, §1681i(a)(5) provides that after Experian has completed the forgoing steps and reinvestigation that if: "an item of information is found to be inaccurate or incomplete or cannot be verified," Experian must delete or modify the information.

47.     Experian violated 15 U.S.C. §1681i(a)(1) by its conduct related to Ms. Enright's disputes that it received as identified in the factual averments because it did not conduct a reasonable reinvestigation of the disputes that Ms. Enright submitted to Experian.  At best, a third party issued an ACDV on Experian's behalf, which Experian knows is not a proper reinvestigation of a consumer dispute.  "[A] 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Cushman v. Trans Union Corporation*, 115 F.3d 220, 225 (3d Cir. 1997).

48.     Experian also violated 15 U.S.C. §1681i(a)(4) after receiving Ms. Enright's dispute letters because Experian lacks any evidence that it reviewed and considered the dispute letters including the representations regarding the payment history and the underlying account transaction. Because Experian uses outsourced third-party processors located in Chile and other countries, Experian incentivizes low-cost review at the expense of detailed review and consideration of the specifics of the disputes.

49.     The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must conduct the reinvestigation after receiving the consumer's credit dispute letter and unless it is able to verify said information Experian must delete the disputed account from the credit file as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or

incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer. 15 U.S.C. §1681i(a)(5)(A) (emphasis added)

50.     According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate." Based upon the circumstances, Experian knew that there was a problem with the data on Ms. Enright's credit file, knew that she did not default on the account in the manner that Chase reported, and knew that the data that it maintained regarding the account was inconsistent, changing and facially inaccurate in the context of the credit dispute letters. Rather than undertake a more reasonable and detailed reinvestigation, Experian contracted for an outsourced third-party processor to issue a coded dispute with Experian's computers "verifying" the information with no meaningful reinvestigation after receiving the ACDV response from the furnisher of the information. This procedure is known by Experian to have flaws that result in credit report inaccuracies when employed in scenarios such as the facts identified herein. Experian cannot "verify" the accuracy of the information when there is so much information that it must ignore in order to parrot the information that Chase reported to it about the account.

51.     Experian negligently and recklessly implemented a system with a total disregard for the requirements of §1681i(a)(5). Rather than allow these processors to review and consider the consumer's dispute package together with the furnisher's ACDV response and make the required determination of §1681i(a)(5)(A), Experian automates that process and simply sends the ACDV response to its computer for automated updating and processing. As a result, Experian fails to conduct the required determination mandated by §1681i(a)(5)(A) and instead simply parrots whatever response the furnisher provides back to it in the ACDV exchange without

reasonably considering what information it had in front of it and what it could see was the cause of the disputed data.  If Experian determined that the information was too difficult to verify for purposes of the dispute, the proper response is to delete the information as unverifiable.  Instead, Experian defaults to the furnisher's ACDV response no matter how ridiculous or inconsistent as the facts of this case where simple math proved that Ms. Enright paid far more on the lease account than she ever owed according to Experian's own data.

52.     Ms. Enright suffered actual damages including time spent addressing the problem, improper denial of access to credit, inability to obtain credit or obtain credit on the terms she should have received, as well as emotional distress damages with attendant physical manifestations.  In addition, punitive damages are necessary based upon Experian's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

### COUNT II
### Fair Credit Reporting Act
### 15 U.S.C. §1681e(b)

53.     Plaintiff incorporates paragraphs one (1) through fifty-two (52) as if fully stated herein.

54.     Defendant Experian has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Experian is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report. Experian knew or should have known that furnishers of data like JPMC and Subaru Finance were experiencing growing pains and adjustment issues in the early phases of Covid.  Funds were not being posted correctly, co-

workers were not communicating as they had when they were all in the office and the data was more susceptible to errors and inaccuracies.

55.     Experian failed to enact reasonable protocols and procedures to take into consideration the changed situations in the operation of furnisher entities during Covid.  Whether it was for increased Experian review of disputes or different protocols for their furnishers, Experian failed to enact and follow reasonable procedures to continue to report trade line data accurately during and after Covid.

56.     Experian willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Ms. Enright when it provided credit reports to her lenders as detailed in the factual statement.  Discovery is necessary related to additional occasions that Experian issued an inaccurate credit report.

57.     Experian's publishing of the inaccurate information was a substantial factor in the stress and strain Ms. Enright suffered from knowing that her inability to obtain new credit was not her fault and was the fault of Experian.

58.     Ms. Enright suffered actual damages including time spent addressing the problem, improper denial of access to credit, inability to obtain a mortgage on the terms desired, as well as emotional distress damages with attendant physical manifestations.  In addition, punitive damages are necessary based upon Experian's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

59.     Punitive damages are necessary because Experian has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because Experian fails to invest the resources into enacting procedures to protect consumers.  Experian has

implemented procedures to allow inaccurate data to remain in its system that cannot be verified if reinvestigated properly. In this case it was clear from Experian's own records, data and information about this account that it was an auto lease that ran through the end of November 2020, that she was continuing to make lease payments and that there was no evidence or basis to claim that the account was charged off a few months prior to the end of the lease term. Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

### Prayer for Relief

Wherefore, the Plaintiff prays that the Court award the following relief:

a)      Actual damages based upon Defendant's violations of the FCRA;

b)      statutory damages against Defendant's based upon violations of the FCRA;

c)      punitive damages based upon the violations of the FCRA

d)      costs and reasonable attorneys' fees incurred by the Plaintiff;

e)      prejudgment interest

f)      all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted,
Patricia Enright

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr. Suite 201
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582